# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

———————————————————————————————

ANNEMARIE P.,[1]

                    Plaintiff,

          v.                                              3:23-CV-1415
                                                          (MJK)

LELAND DUDEK,
Acting Commissioner of Social Security

                    Defendant.

———————————————————————————————

PETER A. GORTON, ESQ., for Plaintiff
KRISTINA COHN, Special Asst. U.S. Attorney, for Defendant

MITCHELL J. KATZ, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

Plaintiff commenced this action pursuant to the Social Security Act, 42 U.S.C. §

405(g), seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner"), denying her application for benefits. This matter was referred to me,

for all proceedings and entry of a final judgment, pursuant to N.D.N.Y. General Order

———————————

[1] In accordance with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73,

N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. No. 7). Both parties filed

briefs (Dkt. 12, 14, and 15), which the Court treats as motions under Fed. R. Civ. P.

12(c), in accordance with General Order 18.

## I.    **PROCEDURAL HISTORY AND FACTS**

The parties are familiar with the procedural history and the facts of this case. The

Court will include the relevant facts as necessary in its analysis below. The Court does,

however, want to highlight the Appeals Council's Orders dated March 22, 2021 ("AC

Order #1) and January 10, 2023 (AC Order #2).

AC Order #1 was issued after the first administrative hearing on March 6, 2019,

upon remand from the District Court, and provides in part that the

ALJ will:

> Give further consideration as to whether the claimant has a severe
> impairment (20 CFR 404.1521ff).
>
> Further, if necessary, obtain evidence from a medical and psychological or
> psychiatric expert related to the nature and severity of and functional
> limitations resulting from the claimant's impairments (20 CFR
> 404.1513a(b)(2)).
>
> As warranted, proceed through the remaining steps of the sequential
> evaluation process.

(T. 674-75).

AC Order #2 was issued after the second administrative hearing on

2

November 18, 2021, upon remand from the District Court, and provides in part that:

> The hearing decision does not contain an adequate evaluation of
> whether the claimant's migraine headaches was a severe impairment.
> The Administrative Law Judge stated 'the medical evidence of record does
> not support the finding that the claimant had ongoing, frequent migraine
> headaches' but that 'the claimant's migraines had reduced in frequency and
> severity with medication compliance of Midrin, Amitripyline and Inderal'
> (Decision, page 4). The Administrative Law Judge stated an August 21,
> 2014 letter from Dr. Rasheed 'reflects that the claimant reported intermittent
> headaches and that Midrin was working well' (Decision, page 4). However,
> that August 2014 note while stating the claimant has intermittent headaches
> and that Midrin was working well, also stated the claimant got eight to ten
> headaches a month (Exhibit 24F, page 1). That note also indicated the
> claimant was taking Inderal over the last few months without any significant
> change or improvement (Exhibit 24F, page 1).
>
> While the Administrative Law Judge did cite to other treatment
> records from 2016-2018 that indicated better control of headaches (Decision,
> page 4), the Appeals Council in the March 22, 2021 remand order noted in
> finding impairments not severe 'the Administrative Law Judge discussed
> evidence after the claimant's date last insured but did not address some
> evidence prior to that date that may be supportive of a severe impairment'
> (Exhibit 5A, page 3). Given the deficits in the consideration of the evidence
> prior to the date last insured, further evaluation of the severity of the
> claimant's migraine impairment is warranted.

(T. 1210-11)

The Appeals Council's January 10, 2023 Order provides that upon remand, the

Administrative Law Judge will:

> Give further consideration to whether the claimant's headache
> impairment was a severe impairment.
>
> Give further consideration to the claimant's maximum residual functional
> capacity and provide appropriate rationale with specific references to
> evidence of record in support of the assessed limitations (20 CFR 404.1545
> and Social Security Ruling 96-8p).

3

> Give further consideration to whether the claimant has past relevant work
> and, if so, can perform it (20 CFR 404.1560(a)-(b)). If warranted, obtain
> vocational expert evidence to assist in evaluating whether the claimant can
> perform past relevant work.

(T. 1211).

## II.   **GENERALLY APPLICABLE LAW**

### A.   **Disability Standards**

To be considered disabled, a plaintiff seeking DIB or SSI must establish that they

are "unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death, or

which has lasted or can be expected to last for a continuous period of not less than twelve

months …" 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is
> not only unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for him,
> or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and

416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities.  If the claimant suffers such an impairment, the third inquiry is

> whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience … Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*See Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013*); see also* 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920.

The plaintiff has the burden of proof to establish a disability at the first four steps. *Selian,* 708 F.3d at 418. However, if a plaintiff establishes that their impairment prevents them from performing his past work, the burden shifts to the Commissioner to prove the final step. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court "is limited to whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian,* 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)) (internal quotation marks omitted); *see also Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the

administrative record. *Id.* However, this standard is a very deferential standard of review "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *see also Selian,* 708 F.3d at 417 (2d Cir. 2013) ("the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn") (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Id.*; *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) ("[W]e are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony[.]"). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004).

## III.   THE ALJ'S DECISION

At step one of the sequential analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 9. 2011, the alleged onset date. (T. 1148). At step two, the ALJ found that plaintiff had the following severe impairments – degenerative joint disease of the right knee, degenerative disc disease of the cervical and lumbar spine, and osteoarthritis of the right knee. (T. 1148). At step three, the ALJ determined that Plaintiff's impairments, whether considered singly or in combination, did not meet or medically equal the criteria of any listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P.  (T. 1152).

Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform

> less than the full range of light work as defined in 20 CFR 404.1567(b) because she could occasionally lift ten to fifteen pounds, frequently lift zero to ten pounds, stand and/or walk for four hours in an eight hour day and sit for up to six hours in an eight hour day. The claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant could not work with dangerous machinery or at unprotected heights. She could not use ladders, ropes, or scaffolds. The claimant could perform frequent reaching in all directions with her right arm.

 (T. 1154).

In making the RFC determination, the ALJ stated that although he considered all the evidence and the extent to which Plaintiff's medically determinable impairments could "reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not

7

entirely consistent with the medical evidence and other evidence in the record." (T. 1156).

At step four, the ALJ found that Plaintiff could perform past relevant work as a receptionist. (T. 1161). Finally, at step five, the concluded that Plaintiff was not disabled. (T. 1162).

## IV.  **ISSUES IN CONTENTION**

Plaintiff argues that remand is warranted because the ALJ made numerous determinations that were not supported by substantial evidence and that the ALJ failed to apply the correct legal standards. Specifically, Plaintiff contends that the ALJ erred by:

1. making the very same errors as the prior remands by improperly relying on evidence after post-DLI;

2. improperly relying on largely irrelevant evidence to discount the severity of Plaintiff's migraines;

3.  failing to find Plaintiff's migraines severe at step two;

4. improperly rejecting the undisputed medical opinion on the issue of time-off task and/or absenteeism without identifying a contrary medical opinion;

5. improperly weighing the medical opinions evidence, including failing to apply the treating physician rule;

6. failing to address the need to change positions; and

7. improperly concluding that Plaintiff can perform past relevant work.

(Plaintiff's Brief (Pl. Br.) at 9-27).

Defendant contends that the Commissioner's determination should be affirmed because there is substantial evidence to support the ALJ's determination that Plaintiff's

8

impairments were not severe during the relevant period and that substantial evidence supports the ALJ's evaluation of the medical source evidence. (Defendant's Brief (Def. Br.) at 4-19).

For the reasons stated below, the Court finds that the ALJ's determination that Plaintiff did not have a severe impairment at step two of the sequential analysis was the product of legal error and not supported by substantial evidence.[2]

## V.    **ADMINISTRATIVE MANDATE RULE**

### A.    **Legal Standard**

"In judicial decision making, lower courts must follow the 'mandate rule' inherent in the 'hierarchical decision-making systems' created by the appellate process." *Barbara H. v. Comm'r of Soc. Sec.*, No. 5:23-CV-472 (DNH/ML), 2024 WL 1721248, at *6 (N.D.N.Y. Apr. 4, 2024) (quoting *Stacey D. v. Comm'r of Soc. Sec.*, No. 3:20-CV-949 (FJS/ATB), 2022 WL 939411, at *5 (N.D.N.Y. Jan. 1, 2022), *report recommendation adopted*, 2024 WL 1717370 (N.D.N.Y. Apr. 22, 2024). "Under the mandate rule, 'where a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court.'" *Id.* (quoting *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 175 (2d Cir. 2014)).

---

[2] The Court recognizes that Plaintiff asserts numerous bases for remand. However, the ALJ's failure to account for Plaintiff's migraine headaches at step two of the sequential analysis is a sufficient basis on which to remand this matter without the need to address Plaintiff's remaining arguments.

In the Social Security context, that hierarchical decision-making system vests power "in ascending order, in an administrative law judge, the Appeals Council, the district court, the court of appeals, and the Supreme Court." *Holst v. Bowen*, 637 F. Supp. 145, 147 (E.D. Wash. 1986). Under that system, "the Supreme Court overrules appellate court decisions, not the other way around. The court of appeals overrules decisions of the trial court, not the other way around. And the district court overrules the Appeals Council, not the other way around." *Holst*, 637 F. Supp. at 147. Extending that to the administrative process, the Appeals Council overrules the ALJ, not the other way around. The Social Security regulations embody that principle by imposing what has been called an "administrative version" of the mandate rule. *See Barbara H., 2024 WL 1721248,* at *7 (quoting *Stacey D.*, 2022 WL 939411 at *6). An ALJ considering a matter on remand "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §§ 404.977, 416.1477(b) (emphasis supplied). "Accordingly, 'an ALJ's failure to comply with the Appeals Council's order constitutes legal error and necessitates a remand.'" *Tracy v. Colvin*, No. 1:15-CV-00980,  2017 WL 279556, at *2 (W.D.N.Y. Jan. 23, 2017) (alteration omitted) (quoting *Scott v. Barnhart*, 592 F. Supp. 2d 360, 371 (W.D.N.Y. 2009)); *see also King v. Colvin*, No. 18-CV-6586, 2020 WL 1080411, at *3 (W.D.N.Y. Mar. 6, 2020) (collecting cases holding that "failure to comply with the Appeals Council's remand order ... constitutes reversible error.").

### B. Analysis

#### i. Medical Records

The ALJ's failure to comply with AC Order # 2 directing him to consider whether Plaintiff's migraines were a severe impairment under step two of the sequential analysis is evident throughout his Decision. As to Plaintiff's medical records, the ALJ notes that "[a]lthough the claimant's treatment records documented migraine headaches, the medical evidence of record does not support the finding that the claimant had ongoing, frequent migraine headaches." (T. 1148). He then states, "[r]ather, the medical evidence of record shows the claimant's migraines had reduced in frequency and severity with medication compliance of Midrin and Amitriptyline." Each of the exhibits cited by the ALJ following this sentence were post-DLI. (*Id.*). The ALJ explicitly concedes that Plaintiff suffered from migraines during the relevant period, but then uses post-DLI evidence to support his conclusion that the condition was not a severe impairment. While post-DLI evidence may be relevant to establish the existence of a condition during the insured period, it is improper to use post-DLI evidence to support a conclusion that the condition was not severe during the insured period. *See Rico v. Saul,* No. 19-CV-4761, 2020 WL 6746831, at *2 (ALJ committed procedural error where post-DLI records not considered regarding claimant's pre-DLI impairment) (citation omitted). That is, evidence of medical improvement post-DLI is not relevant to

the severity of the condition pre-DLI. And of course, it is axiomatic that if the condition improved post-DLI, it must have been worse pre-DLI.

The ALJ notes example after example of the <u>lack of documentation</u> of migraines in medical records to support the conclusion that if Plaintiff "was experiencing headaches eight to ten times per month, they would have appeared more often in the record." (T. 1149). It is axiomatic that a claimant bears the burden of establishing that they have a medically determinable impairment. *See Woodard v. Berryhill*, 2018 WL 3536084, at *4. It is also true that the lack of medical record evidence showing the presence of headaches can be fatal to a disability benefits claim. *See Ormberg v. Astrue*, 254 F. App'x 589 (9th Cir. 2007) (holding that the plaintiff's headaches were not severe where "the record demonstrates that for the year and a half before her hearing" the plaintiff "did not report a single headache to a doctor. During this same period she had several extensive visits with her regular doctor, to whom she reported on a large number of other health issue."); *see also Conetta v. Berryhill,* 365 F. Supp. 3d 383 (S.D.N.Y. 2019) (granting judgment on the pleadings to Commissioner where the ALJ found that shoulder impairment was not severe because, in part, the treating physician's notes did not include plaintiff reporting shoulder pain).

Here, however, there is no lack of medical record evidence showing that Plaintiff suffered from migraines. Plaintiff persuasively argues that her failure to complain about migraines to her physical therapist and orthopedist is simply not relevant, as neither

12

were treating her for that condition. It thus cannot be fairly used as evidence of the lack of severity of the condition, especially as the ALJ concluded that "there is evidence that the claimant also has migraine headaches …." (T. 1148). Was it appropriate for the ALJ to conclude that Plaintiff's migraines were not severe simply because she did not report it to medical professionals who do not treat that specific condition? The Court answers this question in the negative.[3]

Plaintiff also correctly notes that the severity analysis should not be dependent at all on her failure to tell the attending staff in the emergency room after suffering an assault causing serious injury, "oh, by the way, I also suffer from migraines." The severity analysis of a condition should be based on the medical record evidence that was submitted for consideration.

While the ALJ emphasized the lack of the medical record entries of the condition, the ALJ's analysis did also include some, but not nearly all, references to Plaintiff's migraines found in the longitudinal record. The ALJ noted that in April, May, and June 2012 (pre-DLI), Plaintiff canceled a physical therapy appointment due to a migraine headache. (Tr. 1148). Similarly, the Decision noted that Dr. Rasheed (a neurologist)

---

[3] One can only guess whether the ALJ would have found the condition severe if Plaintiff had complained about migraines at every single visit with every single doctor or specialist, or whether the ALJ would have been (and appropriately perhaps) skeptical of the motive for doing so.

documented Plaintiff's migraines in his letter dated August 21, 2014, also pre-DLI. (T. 1149, 1085).

The ALJ noted that in October 2014, Plaintiff's primary care provider reported that she "had migraines, but also DDD of the cervical spine." (T. 1149).[4] The ALJ also noted that the November 2014 primary care provider's record showed migraine headaches "listed under the claimant's past medical history." (T. 1150). The Court concludes that this medical provider entry was a mistake for the reasons that follow.

The primary care provider's records show migraine as an "active problem" in March 2013, October 2013, March 2014, April 2014, May 2014, and October 2014. ( T. 432, 4228, 414, 408, 396). In each of these months (except March 2013), Plaintiff was prescribed Propranolol which is a medication used to treat migraines. (T. 428, 417, 410, 403). Migraine headaches continued to be an "active problem" as reflected in the primary care provider's records during 2015 and 2016, post-DLI. (T.375, 382, 375, 367, 355). This record evidence was not noted by the ALJ.

Thus, if the ALJ had reviewed the primary care provider's notes to find references to migraines as carefully as he reviewed the other medical records to show the absence of the same, he would have observed that migraine headaches were most certainly an active problem before, during, and after November 2014, notwithstanding the provider's self-evident error concerning the latter entry. Furthermore, the fact that

---

[4] The juxtaposition of the two diagnoses is suggestive of the ALJ's dismissiveness of the migraines.

the post-DLI medical records reflect migraine headaches as an ongoing medical condition, would have also highlighted the obvious error, and in any event, the ALJ's failure to consider this evidence contributed to his analytical and legal error.

### ii. Agency Medical Examiner – Dr. Ronald Kendrick

During the second administrative hearing on November 18, 2021, the ALJ called Ronald Kendrick, M.D. as a medical expert to testify. Dr. Kendrick is an orthopedic surgeon. (T. 1297). Dr. Kendrick testified that he reviewed the medical exhibits through Exhibit 25F. (T. 1298). On direct examination, the ALJ asked Dr. Kendrick whether he determined if Plaintiff suffered from any medical impairments, from the onset date through the DLI.  Dr. Kendrick's testimony focused on Plaintiff's orthopedic issues which he identified as severe impairments and concluded that none of them either individually or in combination met or equaled any of the Commissioner's medical listings. (T. 1299). Dr. Kendrick testified that Plaintiff had a functional capacity of somewhere between light and sedentary. (T. 1300). The ALJ gave Dr. Kendrick's opinion "significant weight based upon program and professional expertise and ability to review the entire medical record including all reported relevant clinical and diagnostic findings when arriving at his conclusions." (T. 1160). The ALJ nevertheless concluded that "given that the claimant's migraines were in fact 'intermittent' and well controlled with medication, as above described, the undersigned finds that they are a non-severe impairment." *Id.*

On cross examination, Plaintiff's attorney called Dr. Kendrick's attention to the medical records provided by Dr. Rasheed (plaintiff's neurologist), which included the

diagnosis of migraines pre-DLI. Dr. Kendrick was asked to explain the omission of migraines from the list of medical impairments he had just provided in response to the ALJ's questions, and he stated, "I noted migraine headaches and that should've been listed. I failed to list those." (T. 1301). He was then asked, "So you would agree that that is a – is one of the severe conditions, correct?" (T. 1302). Dr. Kendrick responded, "Yes." (T. 1302). On further examination, Dr. Kendrick testified, "migraine headaches can, you know, affect your ability to even show up for work." (T. 1302). Thus, Dr. Kendrick's opinion confirmed that Plaintiff's migraines were a severe impairment, and it was his mistake not to include that condition in his list.

Regarding the relative value of the opinion of a non-treating physician versus the treating physician, Dr. Kendrick stated, "Well, the person who actually sees the patient physically and takes care of them is always in the best position to assess them." (T. 1302). Dr. Kendrick observed, "Well, the only problem with taking the word of a patient who's being treated, you know, a physician is usually not home with the patient." (T. 1305). He continued that the patient comes to the doctor and reports how they feel, and "they're not going to tell him about the good days they have. They're going to tell him about the bad days they have because they don't want to have bad days." (T. 1306). He opined that the doctor has no way to confirm the number of good days and bad days, and that there is just no way of predicting how many days they are going to miss. "It could be true. It could be not true." (T. 1306).

When asked to review records concerning migraines, Dr. Kendrick identified Exhibit 5F10 (R. 454), which is a letter from Dr. Rasheed to Dr. Wasco, plaintiff's primary care physician. Dr. Kendrick agreed that the injury sustained in the assault in 2011 was consistent with an exacerbation of the migraines. (T. 1310). Regarding attendance at work and concentration, Dr. Kendrick noted that migraines would have an impact on both, stating, "Yes it would, if she had the migraine during a workday. You know, she could have them on weekends. They occur any time." (T. 1311).

On redirect, the ALJ questioned Dr. Kendrick about pain medication, and he noted that Plaintiff had been prescribed Amitriptyline which "seemed to help her migraines … [b]ut, at any rate, Amitriptyline seemed to reduce the number of migraines she had to only a couple times a month, which is a real improvement, obviously, for her." (T. 1314). This evidence concerning the "real" improvement of Plaintiff's migraine condition is post-DLI. The ALJ did not develop Dr. Kendrick's testimony concerning migraines as a severe impairment in conjunction with the other severe impairments that he addressed on direct testimony, thereby violating AC Order #1. The ALJ then recalled Plaintiff to give testimony concerning her work history. Interestingly, having just heard testimony from Dr. Kendrick concerning migraines (which was likely a surprise to the ALJ as that testimony was not developed on direct examination), the ALJ did not question Plaintiff about her specific migraine history. The ALJ only examined Plaintiff about her past relevant work history.

17

### iii.    Third Hearing

The ALJ's errors at the second hearing were the subject of a remand decision. On remand (for the third time), the ALJ observed that AC Order #2[5] directed him to give consideration to Plaintiff's migraine headaches as a severe impairment as well as Plaintiff's "prior relevant work." (T. 1173). At the third hearing, Plaintiff was recalled but the ALJ only asked her questions about past relevant work; there were no further questions concerning Plaintiff's migraines. (T.1172-1178). Notwithstanding AC Order #2, the ALJ did not call a neurologist to testify as a medical expert, or even recall Dr. Kendrick to tie up the loose ends left by the ALJ's second decision, once again violating a direct order from the AC. (*Id.*).

Plaintiff testified about migraines during the first hearing on March 6, 2019. In response to the ALJ's questions, Plaintiff talked about a migraine trigger, and nerve pain in her neck, which was diagnosed following the assault in 2011. (T. 36). Plaintiff testified that taking the migraine medication puts her to sleep, and that she retreats to a darkened room for the rest of the day until she feels some relief. (T. 36-37). She then feels "just wobbly like fuzzy, like fuzzy, and so I just stay in bed." (T. 37). This was the entirety of the testimony elicited by the ALJ about migraines. The ALJ asked no questions concerning frequency, duration, and pain levels.

---

[5] The ALJ obviously also failed to comply with AC Order #1, thus exacerbating the errors rather than addressing them as was evident at the third hearing.

On examination by counsel, he directed Plaintiff's attention to the year leading up to Christmas 2014 (pre-DLI). Plaintiff testified that she was having migraines "eight to ten a week." (T. 39, 41). When a migraine started, Plaintiff testified that she took Midrin and retreated to her bedroom. (T. 46). She also avoided contact with her family and stayed quiet and alone until she felt better, after about three hours. (*Id.*).

As previously noted, Plaintiff testified that during the relevant period, migraines occurred on average eight to ten times per week. The primary care provider's records showed that migraines were an ongoing or an "active problem" during the relevant period, and the only evidence showing that the migraines were "well controlled with medication" was post-DLI. R. (T. 1160).[6] Interestingly, of those instances of migraines being specifically reported in the medical records that the ALJ did identify, three of them were phone calls by family members to cancel Plaintiff's medical appointments

---

[6] The ALJ cited to Exhibit 4F at p. 7 (T. 345) (October 14, **2016** which states "no headache and no dizziness" and migraine headaches under "active problems") and p. 11 (T. 349) (which says nothing about migraines)). However, in that same post-DLI record, migraine headache medication regimen is listed. (T. 350). The ALJ also cited to Exhibit 5F at p. 4, which is Dr. Rasheed's December 6, **2016** letter to Dr. Wasco. (T. 442). The ALJ cited to Exhibit 7F at p. 3, a physical therapy note dated January 3, **2017**, which refers to medication for migraine prophylaxis (amitriptyline) and Midrin for migraine onset. (T. 467). The ALJ also cited to Exhibit 11F at pgs. 18 and 30 (notes of orthopedic treatment from February **2017** to October **2018**) which says nothing about migraines, but the notes reflect the medication plaintiff was taking for migraines. (T. 515, 527). The ALJ cites to Exhibit 2F at p.3, the primary care provider notes from November 15, **2018**. (T. 532). This page says nothing about migraines, but the notes reflect the medication plaintiff was taking for migraines. However, on p. 6 of those notes, the following entry appears – "2. Migraines – discussed possible option of monthly injectable for prophylaxis, she will discuss with Dr. Rasheed." (T. 535). Finally, to minimize Dr. Kendrick's testimony that migraines were a severe condition (even while according his opinion substantial weight), the ALJ referred to improvement post-DLI, citing to Dr. Rasheed's June 10, **2016** letter. (T. 442-43).

due to migraines. (T. 1147- 49). Each of these events took place pre-DLI and on weekdays in April, May and June 2012 when Plaintiff would have been working in her hypothetical job as a receptionist, providing yet further record evidence of the impact of migraines on the plaintiff's activities of daily living.

Thus, the medical record evidence proves that Plaintiff suffered migraines in 2012, 2013 and 2014, with an exacerbation date co-extensive with the injuries she suffered from the assault in November of 2011. Plaintiff's testimony reflects migraine frequency of eight to ten times per week during the relevant period.

Furthermore, the failure to adduce medical testimony on migraines or at a minimum, to consider the evidence of ongoing migraines through the relevant period, and to classify migraines as a severe impairment at step two, as confirmed by Dr. Kendrick's testimony, materially impacted the ALJ's analysis, and was plain and prejudicial error. It is worth repeating that when presented with Dr. Kendrick's opinion that migraines were a severe impairment, the ALJ did not revisit with Dr. Kendrick his analysis of the effect of the combination of the severe impairments, including migraines, nor did the ALJ undertake the analysis independently.

The ALJ's Decision makes evident his  intent to discount Plaintiff's migraines due to her failure to report the condition to medical providers who did not provide treatment for migraines. The ALJ ignored the medical evidence of record showing that migraines were an ongoing condition which was being medically treated.

Notwithstanding the medical evidence and the AC's direction to the ALJ, the ALJ simply did not consider migraines as a severe impairment and failed to assess the condition in combination with the other severe impairments that were established by the medical evidence. And finally, the ALJ improperly dispensed with the evidence of the severity of the condition during the relevant period by relying on evidence of improvement of the condition post- DLI. The ALJ's failure to proceed as directed by the AC resulted in a determination that was not supported by substantial evidence. It may in fact have been the case that if Plaintiff's migraines were properly evaluated in the five step sequential analysis, the ALJ may have determined that, without more, Plaintiff was in fact disabled or, that Plaintiff's migraines, in combination with her other impairments rendered her disabled. Alternatively, if the ALJ had conducted the analysis as directed by AC Order #2, the ALJ may well have concluded, on a complete record, that the plaintiff was not disabled. This is the analysis that should have been, but was not, undertaken.

## VI.  **REMAND**

This matter is remanded to the Commissioner for an expedited hearing before a different ALJ consistent with this Memorandum-Decision and Order. Courts in this Circuit typically refrain from directing the Commissioner to assign a different ALJ upon remand. *See Hartnett v. Apfel*, 21 F. Supp.2d 217, 222 (E.D.N.Y.1998).

However, in limited instances, it is appropriate to consider whether "a fresh look by another ALJ [upon remand] would be beneficial[.]" *Vicari v. Astrue*, 05 CV 4967, 2009 WL 331242, at *6 (E.D.N.Y. Feb. 10, 2009). In such circumstances, courts, including the Second Circuit, have directed that a different ALJ be assigned on remand. "Specifically, when the conduct of an ALJ gives rise to serious concerns about the fundamental fairness of the disability review process, remand to a new ALJ is appropriate." *Sutherland v. Barnhart*, 322 F.Supp.2d 282, 292-93 (E.D.N.Y. 2004). Courts faced with this question generally consider whether the following factors are present: (1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party. *Id.*

To be clear, the Court is not questioning or raising doubt as to the ALJ's impartiality or conduct. But the Court is concerned that this specific ALJ has on two separate occasions,[7] failed to adequately consider whether Plaintiff's migraine headaches constitute a severe impairment for purposes of step two of the sequential analysis, as directed by AC Order #1 and AC Order #2.

---

[7] The Court recognizes that there have been three hearings. ALJ Ramos was assigned to the last two.

## VII.  **REMAINING ISSUES**

Because the Court is remanding this matter for the reasons more fully stated above, it need not address the remaining argument advanced by Plaintiff.

**WHEREFORE,** based on the findings above, it is

**ORDERED**, that Plaintiff's motion for judgment on the pleadings (Dkt. No. 12) is **GRANTED**; and it is further

**ORDERED**, that Defendant's motion for judgment on the pleadings (Dkt. No. 14) is **DENIED**; and it is further

**ORDERED**, that the decision of the Commissioner is **REVERSED** and this action Is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum-Decision and Order.


Dated:  March 13, 2025

                                                    _____

                                                    Hon. Mitchell J. Katz
                                                    U.S. Magistrate Judge